INMAN, Judge.
This case presents, among other issues, the question of whether an air-conditioning unit attached to the exterior of a mobile home, which unit is dismantled and destroyed causing extensive water damage to the home, is correctly classified as real property or personal property for the purpose of a criminal charge and conviction. Based on the record below, the answer in this case is real property.
Defendant appeals the judgment entered after a jury found him guilty of breaking and entering, larceny after breaking and entering, possession of stolen property, and willful and wanton injury to real property. On appeal, defendant contends that: (1) the trial court erred in failing to strike the victim's testimony that "other witnesses" saw defendant outside her home on the day the air-conditioner was damaged; (2) the trial court erred in denying defendant's motion to dismiss the injury to real property charge because there was insufficient evidence that the air-conditioner was real property; (3) the trial court erred by instructing the jury that the air-conditioner constituted real property; (4) the restitution order requiring defendant to pay $7,408.91 was not supported by evidence; and (5) defendant is entitled to a new sentencing hearing because it is unclear whether the trial court based his sentence on defendant's conviction for felony possession of stolen goods.
After careful review, we conclude that defendant received a trial free of error but remand for resentencing.
Background and Procedural History
On 25 July 2011, Zulema Bass ("Ms. Bass") arrived home and noticed that her mobile home was hot inside even though the air-conditioner was on. After hearing a loud noise outside, she asked her fifteen-year-old son Brendell Bass ("Brendell") to investigate. Brendell went to the back door and began screaming that a man was out there. Ms. Bass ran to the door and saw a man riding away on a bicycle; she only saw half of the man's face and was unable to identify him. Ms. Bass went outside and saw that the air-conditioning unit was "demolished" and noticed a twisted pipe on the ground beside the unit. She also noticed that there was extensive water damage under her home from "pipes leaking everywhere." Ms. Bass called 911. The State did not elicit any identification testimony from Ms. Bass regarding whether the man she saw that day was defendant.
On cross-examination, defense counsel asked Ms. Bass about her inability to identify defendant to police officers. Ms. Bass responded that she could not identify him because she "did not see his whole face ... when [defendant] was riding off." Defense counsel then asked: "So you can't tell this jury that it was [defendant] that was outside your home that day; is that correct?" Ms. Bass replied: "That was him, because I had *413 other witnesses that saw him go on the bicycle in the woods, and my-also my son was there." Defense counsel immediately objected that the answer was nonresponsive and requested that her answer be stricken from the record. The trial court overruled the objection. Ms. Bass did not offer any further testimony clarifying her statement about "other witnesses."
Brendell also testified at trial that, after hearing "loud" noises, he saw a man coming out of the crawlspace beneath their home holding copper wire and went out to confront him. At trial, he identified defendant as the man he had seen and confronted. Brendell testified that once defendant heard him yell, defendant threw the copper wire on the ground beside a tree. Before Brendell was able to answer the State's question as to whether he had ever seen defendant before, defense counsel objected, and the trial court excused the jury to determine whether Brendell's testimony was "objectionable."
During voir dire, Brendell testified that he had seen defendant around the neighborhood about four or five times, including one particular incident where he saw defendant take a refrigerator out of another house in the neighborhood. The trial court allowed Brendell to testify to the jury that he had seen defendant around the neighborhood, but did not allow any testimony concerning the refrigerator incident.
Detective Parchman, the officer who responded to the 911 call from the mobile home, corroborated Brendell's testimony, claiming that Brendell identified the man he saw as defendant.
Jack Gregory ("Mr. Gregory"), a handyman with 40 years of experience, testified that he went to Ms. Bass's mobile home to inspect and attempt to repair the air-conditioner. Mr. Gregory explained that Ms. Bass's air-conditioner was a two-piece unit. The outside unit was a condensing unit, which sat on the ground outside the mobile home and is connected to a second unit. The second unit, known as the A-coil, was located on the inside of the home and sat on the top of the home's heater. A high pressure copper pipe beneath the mobile home connected the outside unit to the indoor A-coil. Mr. Gregory testified that Ms. Bass's outside condensing unit had been completely "gutted." The compressor had been completely removed, and the wiring in the control box had been pulled out. Almost the entire high pressure copper piping that ran beneath the home had been removed. Mr. Gregory also noted some water line damage in the crawlspace of the mobile home; the water lines were broken so extensively that the entire back side of the brick wall on the underpinning was "soaked through." The air-conditioner was inoperable and beyond repair.
Dale Davis ("Mr. Davis") testified that he owned the mobile home but used it as a rental property. He testified that he had received an estimate of over $6,000 to repair "just the AC" from Jackson & Sons.
At the end of the State's evidence, defense counsel made a motion to dismiss the injury to real property charge because the air-conditioning unit "would be more better described as personal property" since part of it was outside of the mobile home's crawlspace. The trial court denied the motion.
During jury instructions, the trial court instructed the jury on the charge of injury to real property as follows:
The [d]efendant has also been charged with willful and wanton injury to real property. For you to find the [d]efendant guilty of this offense the State must prove two things beyond a reasonable doubt:
First, that the [d]efendant injured the air conditioner of Dale Davis. An air conditioner affixed to a house is real property.
And second, that the [d]efendant did this willfully and wantonly[.]
The jury found defendant guilty of all charges. Before judgment was entered, defendant pled guilty to attaining habitual felon status in exchange for the State's recommendation of a mitigated sentence.
On 14 February 2012, the trial court sentenced defendant to 77 months to 102 months imprisonment and ordered defendant to pay $7,408.91 in restitution. The restitution amount was based on the amount Mr. Davis paid to Mr. Gregory to inspect the air-conditioner and fix the water pipes, $918.91, and *414 an estimate from Jackson & Sons to replace the "heat pump" for $6,490.00.
On the same day as judgment was entered but after sentencing defendant, the trial court arrested judgment on defendant's conviction for possession of stolen goods. The trial court did not modify defendant's sentence. Defendant appeals.[1]
Analysis
I. Victim's Testimony Regarding "Other" Witnesses
Defendant first argues that the trial court erred by overruling defense counsel's objection and motion to strike Ms. Bass's testimony concerning her knowledge that defendant committed the crimes because "other witnesses" identified him as the perpetrator. Specifically, defendant contends that Ms. Bass's testimony was nonresponsive and beyond the scope of defense counsel's question, was hearsay, and was not based on personal knowledge. We conclude that defendant was not prejudiced by the testimony.
"The admission of evidence which is technically inadmissible will be treated as harmless unless prejudice is shown such that a different result likely would have ensued had the evidence been excluded." State v. Taylor, 154 N.C.App. 366, 372, 572 S.E.2d 237, 242 (2002). The burden is on the defendant to show that he was prejudiced by the admitted evidence. State v. Durham, 175 N.C.App. 202, 207, 623 S.E.2d 63, 67 (2005) ; see also N.C. Gen.Stat. § 15A-1443(a) (2013). "If there is overwhelming evidence of defendant's guilt or an abundance of other evidence to support the State's contention, the erroneous admission of evidence is harmless." State v. Williams, 164 N.C.App. 638, 644, 596 S.E.2d 313, 317 (2004).
Even if we were to assume, without deciding, that the trial court erred in allowing the testimony and that Ms. Bass's testimony did not constitute invited error because it was nonresponsive, see State v. Wilkerson, 363 N.C. 382, 412, 683 S.E.2d 174, 192 (2009) (noting that because the witness's testimony constituted a "nonresponsive outburst," defense counsel did not "invite" the error), defendant is unable to show that he was prejudiced by this testimony. Defendant argues that Ms. Bass's testimony "impermissibly bolstered the identification of [defendant] as the perpetrator." However, any value in Ms. Bass's nonspecific testimony was negligible given the strength of other undisputed identification evidence. Brendell testified that, on the day in question, he saw defendant coming out of the crawlspace of the mobile home carrying copper wire, and that he had seen defendant in the neighborhood several times over the years. While Brendell admitted that he could not specifically recall defendant's name on the day of the incident, he was able to provide it to Detective Parchman two days later. Detective Parchman corroborated this evidence, testifying that Brendell positively identified defendant as the man he saw coming out of the crawlspace.
In light of Brendell's testimony, which was corroborated by Detective Parchman and not refuted by other evidence, we believe that Ms. Bass's allegedly unresponsive and hearsay testimony had little or no effect on the jury's verdict of guilt. See State v. Anderson, 177 N.C.App. 54, 62, 627 S.E.2d 501, 505 (2006) (holding that our standard of review to determine whether a trial court committed prejudicial error in admitting evidence is "whether a reasonable possibility exists that the evidence, if excluded, would have altered the result of the trial"). Furthermore, we note that the only other reference to Ms. Bass's allegations that "other witnesses" saw defendant ride off on a bicycle that day occurred during cross-examination of Brendell when defense counsel asked if he had "asked other folks in the neighborhood if they had seen anybody on a bike." Brendell replied that he had, but he never testified about what others had told him. Defense counsel then asked Brendell whether he had seen anybody else in the neighborhood besides defendant ride a bike. Brendell replied that he had.
*415 Although it seems likely that Ms. Bass's testimony that "other witnesses" had identified defendant as the perpetrator was based on double hearsay-conversations Brendell had with "other folks"-the probative effect of her testimony was negligible, given that Brendell, in his testimony, never identified the person "others" saw riding a bike, and given that Brendell identified defendant on an entirely independent basis. Therefore, in sum, any error in the admission of Ms. Bass's testimony was harmless.
Defendant's reliance on State v. Mitchell, 270 N.C. 753, 155 S.E.2d 96 (1967), is misplaced. In Mitchell, 270 N.C. at 756, 155 S.E.2d at 99, the defendant was charged with armed robbery and felonious assault for opening the victim's car door, taking the victim's wallet, and shooting the victim. The victim testified that "somebody had told him [that] defendant had admitted [to] taking" the wallet. Id. During cross-examination, the victim's identification of defendant as the perpetrator was "considerably shaken." Id. at 757, 155 S.E.2d at 96. Thus, the inadmissible hearsay was prejudicial because: (1) the evidence constituted an admission of guilt by the defendant, and (2) it was the only significant evidence offered to identify the defendant as the perpetrator. Here, Ms. Bass's testimony that "other witnesses" saw defendant riding his bike that day did not suggest an admission of guilt by defendant. Further, a separate witness, Brendell, in his testimony before the jury identified defendant as the perpetrator. Therefore, Miller is distinguishable and is not controlling.
In sum, where a witness who has not offered testimony identifying defendant as the perpetrator refers in response to cross examination to hearsay evidence that "other witnesses" had identified defendant and where a separate witness positively identified defendant during the trial, any error by the trial court in failing to strike the hearsay testimony was not prejudicial.
II. Denial of Motion to Dismiss
Defendant argues that the trial court erred in denying his motion to dismiss the injury to real property charge because there was insufficient evidence that the mobile home's air-conditioner was real property.[2] Defendant cites State v. Primus, 227 N.C.App. 428, 742 S.E.2d 310 (2013), to support his contention that a mobile home's air-conditioner is personal property. For the reasons explained below, we disagree.
This Court reviews a trial court's order denying a defendant's motion to dismiss de novo. State v. McKinnon, 306 N.C. 288, 298, 293 S.E.2d 118, 125 (1982). "When ruling on a defendant's motion to dismiss, the trial court must determine whether there is substantial evidence (1) of each essential element of the offense charged, and (2) that the defendant is the perpetrator of the offense." State v. Smith, 186 N.C.App. 57, 62, 650 S.E.2d 29, 33 (2007).
Defendant was charged with violating N.C. Gen.Stat. § 14-127, which makes it a crime to willfully and wantonly damage, injure, or destroy real property. Specifically, the indictment charges that defendant injured the air-conditioner in the crawlspace under Ms. Bass's mobile home. On appeal, defendant contends that the Primus decision holds as a matter of law that a mobile home air-conditioner is personal property, so that the trial court should have granted his motion to dismiss the charge of injury to real property.
First, we must determine whether Primus requires us to classify the mobile home's air-conditioner as personal property. The defendant in Primus was convicted of attempted felony larceny and injury to personal property for taking an air-conditioner which had been attached to the victim's mobile home. Id. at 428-30, 742 S.E.2d at 311-12. The defendant had cut the "wires and piping" that secured the air-conditioner to the outside of the mobile home. Id. at 433, 742 S.E.2d at 314. At trial, when instructing the jury on the charge of injury to personal property, the trial court stated that "[w]ires and piping connected to an air-conditioning unit are personal property." Id.
*416 On appeal, the defendant argued that the trial judge's instruction was "an improper expression of the trial judge's opinion as to a factual issue within the province of the jury." Id. at 432, 742 S.E.2d at 313. However, because the trial judge "simply filled in the blanks in the pattern jury instruction for injury to personal property," this Court held that "if the statement amounts to error, it was an instructional error that was not preserved for appeal." Id. at 433, 742 S.E.2d at 314. The Court went on to say that, "assuming arguendo that the trial judge's instruction to the jury was an opinion as to a factual issue, we think the error is harmless" because the "instruction classifying the wires and piping as personal property was supported by the evidence." Id.
Defendant contends that because the Primus Court "classified the injury to the air-conditioning unit ... as injury to personal property, the damage to the air-conditioning unit in this case must also be classified as injury to personal property" based on In re Civil Penalty, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989). However, we are only bound by previous cases that decided the same issue as the one raised in the present appeal. See id. ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court."). The only issue addressed in Primus was whether the judge's statement that "[w]ires and piping connected to an air-conditioning unit are personal property" constituted an improper statement of opinion. Id. at 433, 742 S.E.2d at 314. This Court did not resolve this issue because, as noted in the opinion, this argument amounted to a challenge to the jury instructions, which was not preserved for appeal. Id. Thus, we did not decide whether the classification of the wires and piping as personal property was an instructional error because it constituted an improper statement of the law, the issue raised in this appeal.
Furthermore, while the Primus Court did state that the trial court's classification of "the wires and piping as personal property was supported by evidence," see id., that conclusion followed the phrase "assuming arguendo " and was not relied upon by the Court for its ultimate holding that the trial judge's instruction did not amount to an improper opinion of the court. See generally Amos v. Oakdale Knitting Co., 331 N.C. 348, 359, 416 S.E.2d 166, 173 (1992) (noting that statements not relied upon for the Court's ultimate holding are dicta ). Accordingly, contrary to defendant's assertions, Primus is not binding and does not require a conclusion by this Court that Ms. Bass's air-conditioner must be classified as personal property.
Given the absence of controlling authority on the matter of whether an air-conditioner attached to a mobile home constitutes real or personal property as a matter of law, we must look at how air-conditioners or other similar types of property are classified not only in the criminal law context but also in property law. Chapter 14, the section of our General Statutes containing our state's statutory criminal law, does not provide a definition of "real property," and the only discussion concerning the difference between real property, fixtures, and personal property is in N.C. Gen.Stat. § 14-83.1 titled "Fixtures subject to Larceny," which abolished the common law distinctions between personal property and personal property affixed to real property, which would include fixtures, for purposes of a larceny charge. Thus, under section 14-83.1, which became effective 1 December 2008, the carrying and taking away of fixtures supports a conviction of larceny whereas, under the common law, it would not. See also P. Hetrick & J. McLaughlin, Webster's Real Estate Law in North Carolina § 2.01 (6th ed.2011) (noting that "[f]ixtures were originally personal property but have been attached to land in a more or less permanent manner under such circumstances to be considered in law to have become a part of the real property").
In contrast to the statute defining larceny to include both personal property and fixtures which are "considered" real property as a matter of law, our General Statutes define as separate offenses injury to real property, a Class 1 misdemeanor under N.C. Gen.Stat. § 14-127, and injury to personal property, a Class 1 or 2 misdemeanor, depending *417 upon the amount of damage caused, under N.C. Gen.Stat. § 14-160. Thus, the classification of the type of property a defendant is charged with injuring is a necessary determination.
"A fixture has been defined as that which, though originally a movable chattel, is, by reason of its annexation to land, or association in the use of land, regarded as a part of the land, partaking of its character." Little v. Nat'l Serv. Indus., Inc., 79 N.C.App. 688, 692, 340 S.E.2d 510, 513 (1986) (quoting 1 Thompson on Real Property). While fixture law is usually applicable in controversies involving possession of or interests in the fixture, it is relevant in this case to determine whether the air-conditioner here was a fixture which would properly be classified "in law" to be part of the real property.
[S]everal tests for resolving the question of whether a chattel attached to real property becomes real property or remains personalty have been referred to in the cases. They include (1) the manner in which the article is attached to the realty; (2) the nature of the article and the purpose for which it is attached to the realty; and (3) the intention with which the annexation of the article to the realty is made. Under the modern view, the controlling test is the intention with which the annexation is made.
Little, 79 N.C.App. at 692, 340 S.E.2d at 513 (internal citations omitted); see also Moore's Ferry Dev. Corp. v. City of Hickory, 166 N.C.App. 441, 445-46, 601 S.E.2d 900, 903 (2004).
These concepts of how and when personal property becomes so attached to real property that it becomes part of the real property have been applied in the criminal context for charges other than injury to real property. For example, in State v. Schultz, 294 N.C. 281, 282, 240 S.E.2d 451, 453 (1978), the defendant was charged with larceny for taking bronze urns and vases that had been attached to grave markers from a cemetery. Schultz, 294 N.C. at 282, 240 S.E.2d at 453. At the time, the common law definition of larceny was in effect and a person could not be convicted of larceny for taking and carrying away property affixed to the ground, i.e., fixtures. Id. at 286, 240 S.E.2d at 455. Although, clearly, the grave markers to which the urns and vases were attached would not be subject to common law larceny because they were "affixed to the soil," the Court concluded that the urns and vases constituted personal property. Id. at 286, 240 S.E.2d at 456. Specifically, the Court noted that although the urns and vases were "fastened to the [bronze grave] markers," they were attached by "a slight twist so as to make grooves and projections upon the urn or vase fit into prepared slots in the receptacle." Id. However, the urns and vases were "not a part of [the] marker[s]." Id. Furthermore, "[t]he [bronze grave] marker serves its contemplated purpose whether or not the urn or vase is so affixed." Id. In contrast, the only purpose for attaching the urns and vases was to prevent them from overturning, and they also could be used for their contemplated purposes regardless of whether they were attached to the grave markers. Id. at 287-88, 240 S.E.2d at 456. Finally, the Court noted that, given that the defendant removed a great number of them in a very short period of time, the vases and urns were "easily separated" from the bronze grave markers even though the person who placed them "contemplated their remaining so in place."Id. Accordingly, the Court held that the urns and vases were personal property and could be the subject of the larceny charges. Id.
Similarly, in State v. Patterson, 2011 WL 2848770, *2 (COA10-1240) (July 19, 2011) (unpublished), the defendant was charged with larceny based on "taking and carrying away the personal property of CSX," a railroad company. The "personal property" at issue was 4,800 feet of copper signal wire that had been affixed to signal poles. Id. at *2. Because the offenses occurred prior to 1 December 2008, N.C. Gen.Stat. § 14-83.1, which, as discussed above, abolished the common law distinction between personal property and personal property affixed to real property for purposes of larceny, did not apply. Therefore, if the copper wire was so affixed to the poles that it became real property, the defendant could not have been guilty of larceny. The Patterson Court applied the logic *418 enunciated in Schultz to conclude that the copper wire was affixed to real property because: (1) the signal poles themselves were buried up to eight feet into the ground, making them fixtures appurtenant to the land; (2) the copper wires were attached to the signal poles in such a way that removing them would require cutting the wires and they were not, as were the urns at issue in Schultz, attached with a "slight twist"; and (3) the attachment of the copper wire to the poles was a "crucial part of the contemplated purpose" of both the signal poles and the wire since their purpose was to carry electronic signals along the tracks. Id. at *3. Accordingly, "the copper wire was attached to the signal poles, as to make it an integral part of such signal poles and [was], therefore, real property or chattels real." Id. Accordingly, this Court reversed the trial court's order denying the defendant's motion to dismiss the felony larceny charge. Id.
Even though not controlling in this case, we adopt the logic used in Schultz and Patterson and concepts of fixture law to determine whether the air-conditioner attached to Ms. Bass's mobile home was affixed such that "it, too, became an irremovable part of the [mobile home]." Patterson at *3. The air-conditioner at issue in this case comprised two separate units: an inside unit, referred to as the A-coil, which sat on top of the home's heater, and an outside condensing unit, which had a compressor inside of it. The two units were connected by copper piping that ran from the condenser underneath the mobile home into the home. Mr. Gregory testified that the compressor, which was located inside the condensing unit, had been totally "destroyed," and that although the condensing unit itself remained in place, it was rendered inoperable. Thus, unlike the vases and urns in Schultz that could be simply "twisted off," the entire air-conditioner could not be removed but had to be "gutted" and removed in pieces. Moreover, when defendant cut the copper piping underneath the home, he caused significant damage to the water pipes that were also located in the crawlspace. Thus, here, not only could the air-conditioner not be easily removed from the mobile home but it also could not be easily removed from other systems of the home given the level of enmeshment and entanglement with the home's water pipes and heater.
While the mobile home could serve its "contemplated purpose" of providing a basic dwelling without the air-conditioner, see Patterson at *3, the purpose for which the air-conditioner was annexed to the mobile home supports a conclusion that it had become part of the real property. Mr. Davis attached the air-conditioner to the mobile home for the use and enjoyment of Ms. Bass, who was renting the home; thus, a presumption arises that the air-conditioner was attached to enhance the value of the real property and thus became real property. See Little, 79 N.C.App. at 692, 340 S.E.2d at 513 ("The intent with which a party annexes a chattel to real property is determined, in large measure, by the relationship of the parties to the land and to each other. For example, when additions are made to land by its owner, it is generally viewed that the purpose of the addition is to enhance the value of the land, and the chattel becomes a part of the land.").
In totality, given the manner in which the air-conditioner was attached to the mobile home, the fact that it was "gutted" instead of removed entirely, and the fact that it was attached by the property owner to the rental property for the use and enjoyment of the renters, there was substantial evidence in this case that the air-conditioner was real property and not, as defendant contends, personal property. Therefore, the trial court did not err in denying defendant's motion to dismiss based on the classification of the air-conditioner as real property.
III. Jury Instruction
Next, defendant argues that the trial court committed reversible error by instructing the jury that "[a]n air conditioner affixed to a house is real property." Specifically, defendant contends that the classification of the air-conditioner as real property is an incorrect statement of law. We disagree.
N.C. Gen.Stat. § 15A-1232 (2013) provides that "[i]n instructing the jury, the judge shall not express an opinion as to *419 whether or not a fact has been proved and shall not be required to state, summarize or recapitulate the evidence, or to explain the application of the law to the evidence." However, any alleged violation of section 15A-1232 is reviewed to determine whether it constitutes harmless error. State v. Nelson, 298 N.C. 573, 597, 260 S.E.2d 629, 646 (1979).
When reviewing jury instructions, they will be construed contextually, and isolated portions will not be held prejudicial when the charge as a whole is correct. If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for reversal.
State v. McLean, 205 N.C.App. 247, 252, 695 S.E.2d 813, 817 (2010).
As discussed previously, contrary to defendant's contention, Primus is not controlling on this issue. Furthermore, we conclude that the air-conditioner at issue here was properly classified as real property given the nature and circumstances surrounding its annexation to the mobile home.
IV. Restitution
Next, defendant argues that the trial court erred by ordering defendant to pay $7,408.91 in restitution because: (1) the amount was not for damages arising directly and proximately out of the offenses committed by defendant; (2) there was insufficient evidence to support the order; and (3) the award was not within the scope of permissible bases upon which a trial court may order restitution. We disagree.
The trial court may order a defendant "make restitution to the victim or the victim's estate for any injuries or damages arising directly and proximately out of the offense committed by the defendant." N.C. Gen.Stat. § 15A-1340.34(b) (2013). We review de novo whether the restitution order was supported by evidence at trial or sentencing. State v. Wright, 212 N.C.App. 640, 645, 711 S.E.2d 797, 801 (2011). "However, when there is some evidence as to the appropriate amount of restitution, the recommendation will not be overruled on appeal." Id.
Here, after the jury returned its verdict, the State requested that the trial court order restitution even though "the air-conditioner ha[d] not been replaced [yet]." The amount of the requested restitution was based on Mr. Gregory's invoice for his inspection and attempted repair of the air-conditioner-$918.91-and an estimate from Jackson & Sons to replace it-$6,490. Defendant argues that Mr. Gregory's invoice was based on repairs to water pipes, a water line, and a water pump and tank. However, according to defendant, the receipt "failed to link the work completed" on the mobile home to the crimes of which defendant was convicted. Furthermore, defendant asserts that there was insufficient evidence to link the invoice with the mobile home because the receipt did not contain the address of the mobile home but, instead, referenced a subdivision in Goldsboro.
Despite these discrepancies, the receipt was consistent with Mr. Gregory's testimony of the damage he observed at the victim's home and the necessary repairs. Moreover, contrary to defendant's assertions, the description of the work performed was related to defendant's criminal acts of "gutting" the outside unit and cutting the copper piping from underneath the house which, based on Mr. Gregory's testimony, resulted in breaks in the water lines underneath the mobile home. Ms. Bass's testimony corroborated this when she testified that she did not notice any water damage in the crawlspace until immediately after the air-conditioner was damaged. Therefore, there was sufficient evidence to support the trial court's order awarding restitution based on Mr. Gregory's invoice.
Defendant also contends that there was insufficient evidence to support ordering defendant to pay for an entirely new air-conditioning system because "the proper amount of restitution is the fair market value of the property at the time and place of destruction," not the cost to replace the property. Moreover, defendant argues that he should not have to pay for replacement of the heat pump because there was no evidence that defendant damaged the heat pump, only the air-conditioner. We believe that *420 section 15A-1340.34 should be interpreted to allow a defendant who damages property to be held responsible for all damage directly and proximately caused by the injury to property, including reasonable costs of repair and replacement, especially in a case like this where the air-conditioner was completely inoperable due to defendant's actions. Defendant has provided no case authority prohibiting this interpretation. Furthermore, Mr. Davis testified that the estimate from Jackson & Sons, which was provided to the trial court in support of the restitution award, was for replacing "just ... the AC." Thus, the amount of the restitution with regard to the replacement cost of the air-conditioner was based on "something more than a guess or conjecture," State v. Daye, 78 N.C.App. 753, 758, 338 S.E.2d 557, 561 (1986), and was supported by evidence at trial.
V. Sentencing
Finally, defendant argues that the trial court erred by sentencing him for both felony larceny and felony possession of stolen goods and that the trial court's order arresting judgment for felony possession of stolen goods did not cure the error. We agree and remand for resentencing.
When the trial court consolidates multiple convictions into a single judgment but one of the convictions was entered in error, the proper remedy is to remand for resentencing when the appellate courts "are unable to determine what weight, if any, the trial court gave each of the separate convictions ... in calculating the sentences imposed upon the defendant." State v. Moore, 327 N.C. 378, 383, 395 S.E.2d 124, 127-28 (1990).
Here, defendant was indicted for and convicted of felony larceny and felonious possession of stolen goods ("felony possession"). After the jury returned its verdict, based on the State's agreement to a mitigated sentence, defendant pled guilty to attaining habitual felon status pursuant to N.C. Gen.Stat. § 14-7.6. After determining that defendant had a prior record level of IV, the trial court consolidated the offenses for judgment and sentenced him to 77 months to 102 months imprisonment. Under the version of N.C. Gen.Stat. § 14-7.6 that was in effect at the time defendant committed the offenses, defendant was automatically sentenced as a Class C felon.[3] Although the State requested a sentence at the high end of the mitigated range, the trial court imposed a sentence in the midpoint of the mitigated range. Defendant was sentenced to 77 to 102 months imprisonment. The allowable mitigated sentence for these offenses committed by a defendant with a class IV prior record level ranges from a minimum of 66 to a maximum of 166 months imprisonment.
Later the same day, following the sentencing hearing, likely based on the trial court's recognition that a defendant may be not be convicted of both larceny and possession of stolen property based on the same conduct, State v. Perry, 305 N.C. 225, 237, 287 S.E.2d 810, 817 (1982)overruled on other grounds by State v. Mumford, 364 N.C. 394, 699 S.E.2d 911 (2010), the trial court arrested judgment on the felony possession conviction but did not modify defendant's sentence.
Despite the trial court's subsequent order arresting the entry of judgment for felony possession, we are unable to determine whether the trial court gave any weight to that conviction when it sentenced defendant in the middle of the mitigated range instead of at a lower point in that range, especially since the trial court found the mitigating factor that defendant accepted responsibility for his criminal conduct and found no factors in aggravation. Therefore, we must remand this matter back to the trial court for resentencing. See Moore, 327 N.C. at 383, 395 S.E.2d at 128. Sentencing within the mitigated range remains within the trial court's discretion.
Conclusion
In sum, we conclude that the trial court did not commit prejudicial error when it overruled defense counsel's objection and refused to strike hearsay testimony. We further *421 conclude that, given the evidence in this case, the trial court did not err in denying defendant's motion to dismiss the charge of injury to real property and did not err in instructing the jury that the air-conditioner was real property. Because the amount of restitution was supported by evidence at trial, the trial court's order of restitution was without error. Finally, because we are unable to determine what weight, if any, the trial court gave to the erroneous entry of judgment on felony possession despite the fact that the trial court later arrested that judgment, we must remand for resentencing.
NO ERROR IN PART; REMANDED FOR RESENTENCING.
Judges BRYANT and DAVIS concur.

On 27 December 2012, this Court entered an order allowing defendant's petition for writ of certiorari to review the judgment entered.

Neither party raises any question that the mobile home in this case constitutes real property so, for purposes of this opinion, we will treat the mobile home as real property. See N.C. R. App. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned.").

The statute was amended for offenses committed after 1 December 2011 and habitual felons are now sentenced at a felony class level four classes higher than the principal felony. See S.L. 2011-192, s.3(d) (2011).